Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to give their attention for the court is now sitting. God save the United States and this Honorable Court. Good morning. We're happy to hear argument in our first case number 192115. Counsel, whenever you're ready. Thank you, Your Honor. Pam Keenan appearing today on behalf of the petitioner Ms. Gomez. We filed this appeal from an administrative decision by the Board of Immigration Appeals on the basis that the BIA adopting the decision of the IJ ignored compelling, uncontroverted evidence in the record and applied the wrong analysis when determining that Ms. Gomez had not suffered any harm. She suffered persecution because of her membership in one or more cognizable social groups, particularly her family membership and her social group comprised of highly educated professionals working in her home country of Guatemala. We also believe that the BIA and the IJ applied the wrong legal standard when considering Ms. Gomez request for humanitarian asylum. And we also believe that the BIA and the IJ glossed over the question of whether relocation by Ms. Gomez in Guatemala was in fact feasible or reasonable and whether the government in the country of Guatemala could in fact protect her from the persecution and or for purposes of CAT whether or not they were blindly allowing such persecution to occur. Turning to her first question about the persecution that she had suffered and could reasonably expect to suffer, she testified and presented affidavit testimony to the IJ that she was repeatedly made the subject of death threats in connection with extortion attempts and recruitment attempts of her various family members. As this court has held, death threats are considered to be persecution and her testimony was uncontroverted on that aspect and so I think she established that she had clearly suffered past persecution. The testimony, the evidence that came in at her hearing was that first her husband was recruited to work for the gangs and when he refused, the gangs threatened to harm not only him but his family members, which of course would include Ms. Gomez. Does the record tell us how many family members, how many brothers and sisters she has? My recollection, Your Honor, is that she has this one brother who in fact was killed and she has two other siblings who still live in Guatemala. Her parents also live there. And does she maintain that they have also been subject to persecution? Yes, ma'am. Not her parents, her others, excuse me, not her parents but her other siblings. This one sibling, her brother, who was eventually killed by the gangs, she doesn't know if... I was talking about the two, I thought you told me there were two sisters still living in Guatemala with the parents. Is that incorrect? Yes, ma'am. As far as I know, they have not been targeted by the gangs. Ms. Floyd, what evidence did you present that the Zetas remain active in Guatemala so that the internal relocation would not be possible? I'm sorry, Your Honor, you broke up at the first part of your question. Could you repeat that? Sure. What evidence did you present that the Zetas remain active in Guatemala so that internal relocation would not be possible? There was quite a lot of documentary evidence that we presented in the record from various sources and I believe also the State Department reports indicated that the Zetas are an active gang influence in the country. Well, you need more than that, don't you? Well, we had the testimony from Ms. Gomez herself as to her personal experiences and then we had very supporting affidavits and then the documentary evidence that was admitted by the IJ including those State Department reports. Did you have any other questions or shall I proceed with my argument? No, no, no. Don't worry. I'll let you know. Okay. But I thought Judge Keenan had a question. Judge Keenan, did you have a question? No, thanks. Not yet. After her brother refused and the gangs threatened both him and his family, she then found out from her father that the gangs were extorting her father for money and when he could not pay, they also threatened to harm him and his family, which of course included Ms. Gomez. Ultimately, they did in fact kill her brother and there's evidence of that in the record, his death certificate, the report, her testimony, some supporting family affidavits that they did in fact kill her brother and she was very concerned that she would be next in line. After she found out that her father was being extorted, she herself was approached by the gangs. They had connected her with her brother in a moped accident before her brother's death and she was approached by the gangs and told that because she was a public school teacher, which made her a government employee, that they wanted her to run drugs for them, that she would be a very effective mule because she would not be suspected of drug activity because of her education and her government position as a teacher and she refused and based on that, then they began threatening her directly because of her refusal to work for them, death threats. The BIA and the IJ both found that her membership in the family wasn't the basis on which the death threats were directed to her or why she was made the subject of death threats, but I think that that's the inappropriate analysis that they applied in finding that she didn't meet that standard. But for her being a member of the family, those death threats that were made to her husband and to her brother and to her father would not have included her. It was solely because of her membership in those family groups that she was made the subject of the death threats that resulted from her husband and her brother and her father refusing to concede to the demands of the gangs. I did have an opportunity to read the recent decision by the Fourth Circuit in the Hernandez-Cartagena case that was just issued a couple weeks ago where this court discussed the fact that the threats can be made to a family, to the applicant's family, and that the analysis isn't what the motivation was for the gang making those threats to the family member. It could be greed. It could be extortion. It could be a lot of things. But the appropriate analysis is to determine whether or not the death threats that included the applicant were made against the applicant solely because they were members of the family that was being extorted or being recruited to work for the gang. And I think that's exactly what happened here. But for her marriage, her familial relationship with her brother and her father, she would not have been made the subject of those death threats. The ones that were made directly to her as a schoolteacher and an employee were ones that were directed to her, but the fact that there were direct threats to her later doesn't wipe out the fact that she was made the subject of death threats previously solely because she had these family relationships. So we think that the BIA and the IJ ignored substantial evidence and applied the wrong analysis in finding that she didn't qualify for asylum based on prior persecution due solely to her membership in that family group. Counsel, excuse me, this is Judge Heenan. So it's your position then that there can be more than one central reason for the persecution? And that's really, it seems to me that's the linchpin of your argument, isn't it, here today? Yes, ma'am. She had the family group, but then she had the death threats to her directly. But there can be more than one central reason. And we believe that the controverted evidence showed that. Okay. I just wanted to make sure that you were relying on that principle and not something else. Thank you. Yes, ma'am. We also argued that her position as a government employee and a teacher led to her being persecuted, that that was the specific reason that she personally and not someone else was targeted by the gangs and threatened with death if she went on drugs for them. So we have another reason, but these reasons can be intermixed and intermingled and still get us to the same result. We also argued that her open resistance to these gangs was an imputed political opinion, and this was another reason why she was persecuted, why she individually, herself and not someone else, was persecuted and made the subject of these death threats. This court has previously held that a refusal to join the gangs or to work for the gangs has a political dimension, and gangs may target resistors for retaliation as part of that, and that's exactly what happened here. The death threats were made to her because she was openly opposing their efforts to recruit her. She went to the police and reported the persecution that her brother and her father and herself had been suffering. Of course, the persecution only increased after she went to the police. Some of the gangs obviously knew she had done that. Shortly after reporting this to the police, her brother was kidnapped and tortured and his tongue cut and beat up and then, of course, was eventually killed. Yes, ma'am. Counsel, this is Judge Motz. So as I remember it, the BIA judge concluded that what the gang was after was money, and it really didn't matter. They didn't care who they got it from, and so what do you have to say about that? I think that brings us back to the Hernandez-Cartagena decision where this court discussed the fact that the motivation for what the gangs wanted is not the appropriate analysis for purposes of determining whether the applicant has suffered persecution in the form of death threats. No, no, no, Counsel. But it certainly is informative about why they are targeting the person. If they're targeting for money, that's very different than targeting because you're part of the family, right? Well, that was our second basis for appeal. Her first one was that she received death threats with respect to her husband, brother, and father solely because she was a member of the family. They weren't targeting her. I know you say that, but there's a finding to the contrary, isn't there? And I guess what I'm asking is if several members, but not all members of a family, are targeted for financial reasons, does that mean you're targeting them because of their familiar ties automatically, or is it because of the financial reasons? I think that the other members of her family were targeted for financial reasons. I think she was made the subject of death threats solely as a member of those family members who were not acquiescing to the gangs' demands. Well, Counsel, this is Judge Keenan. What about the fact that the family witnessed a gang murder? I haven't heard you say anything about that today. Is that a significant fact in your analysis or not? No, ma'am. That is simply the predicating factor that led to the gang starting to target her family members for working for them and for money. Okay. Thank you. I don't think I understood that answer. I thought you said no, but then the rest of your answers seemed to be yes. No, ma'am. The witnessing of the murder at the very beginning of this whole timeline was how her family first was noticed by the gangs. And shortly after that, her husband started receiving calls from gang members demanding that he come to work for them. I guess what I was interested in that fact was apparently that the gang told her family to forget what they saw or the gang would kill them, the family. Is that an accurate reading of the record? Yes, ma'am, but not the basis of our appeal. Okay. I think my time is up. What do you mean it's not the basis? Did you say it's not the basis of your appeal? She did not claim that that was a specific social group that she belonged to and they were persecuted as a group who had witnessed a gang murder. That was not one of the social groups that she was requesting. The principal social group, the number one social group, is her family. And this happened to a member of her family, right? So it is part of your appeal. It's a fact that helps you a lot. I would think. Explain to me why I'm wrong here because I must be misguided. Well, I have to fess up to you. This is my very first immigration case ever. And so I'm very new to this area of law. But the cases that I read indicated that being a member of a group who had witnessed some sort of gang violence was not a cognizable social group that you would be able to claim you were a member of. It was two or more. Right. But I think, Ms. Keenan, the underlying issue is it was her family that witnessed the murder and was told not to say anything or they would be killed. And you are saying she is being persecuted because of her membership in her family. I see where you're going. I would say that would be an additional helpful factor for my argument that it's a family group that she belongs to. That's her social group and that she's being persecuted as a member of that social group, that particular family relationship. Thank you. I understand. Thank you. Thank you. Any further questions? OK, we'll be happy to hear from the government. Good afternoon. Yes, yes, yes. This particular case, Petitioner's case, however unfortunate, the agency determined that she did not fulfill several of the elements required for asylum. And those conclusions are not only supported by substantial evidence, but we do not see any evidence that would compel reversal of the agency's decision here. With respect to the number of siblings that Petitioner had on page 169 of the administrative record, she actually said she has two sisters and two brothers, one of whom was killed. So that's three siblings. And there's as far as the record is concerned, nobody has been bothered by the gain of burden, the brother that was killed. So that's what the government would agree that that's not dispositive of the question. We do think that that's substantial evidence that tends to negate her claim that she's suffered persecution or has a well-founded future persecution on the basis of her family membership. Counsel? Counsel? Yes. This is Judge Motz. How many siblings would have to be killed before we would draw a line among them? One isn't enough, so. That's a very good question, Judge Motz. I don't think if I was the government, I would go down that road. I don't think that's your strongest argument. Of course, Judge Motz. All right. I would also say that with respect to the direct threats that she received from the gang, direct threats, not threats received from third parties, on page 244 of the administrative record, she admits that the direct interactions that she had from the gangs had absolutely nothing to do with her family, her last name. It was entirely due to her unemployment and the fact that the gangs wanted her to sell drugs. So again, I mean, the only times that she was referenced in family membership was with respect to her husband.  They witnessed the accident in 2008. Apparently in 2009, her husband was told that if you didn't work for us, we will kill your family. They never contacted Petitioner here. And her husband left for the United States in 2010. She did not hear anything from the gang again until 2015. The only remaining aspect of family membership is the extortion, where a family supposedly received extortion threats or their family members would be killed. But the gangs didn't mention that in their interactions with her. There's no evidence suggesting that the brother was killed, however unfortunate, because of this extortion. And again, I won't go down that road, sure. Excuse me, Mr. Stanton. Mr. Stanton, this is Judge Keenan. You said there was no other evidence tying back to the brother, but wasn't there evidence that Ms. Diaz de Gomez received a phone call saying they would do to me what they did to my brother? And she was later approached by the gang members when she was visiting her brother's grave. If they threatened to do to her what they did to her brother, why isn't this more evidence linking her to a particular social group of her family? Well, she was visiting her brother's grave. At the time she was visiting her brother's grave, the gangs really didn't claim any credit for her murder at that time. They just said, if you don't join us, you will join your brother in the grave. That didn't mean they actually killed her. No one knows what happened to the brother. There were no witnesses. He was in a restaurant. He could have been the wrong fish at the wrong time. So she received a phone call. The gangs may have been aware that the brother had been killed, but that doesn't compel the conclusion that they actually did it. Again, she did not report the murder to police. Had she done so, there may have been an investigation concluding that these datas had actually killed the brother. But again, when her own testimony, she did not believe, she did not believe on page 244 that what she received directly from the gang had anything to do with the family relationship. That's her own opinion. So I don't see how the court could possibly reverse the agency's finding that there was no nexus on a family relationship based on that record. Well, counsel, the agency found her credible, correct? Sure, yes, yes. So her testimony is credible. You just disapproved of it. Okay. One second, please. Her testimony is credible. That doesn't mean that, like, she may be telling, she may be not lying, but just because her testimony is credible doesn't mean that the agency has to, like, accept everything you said is factually accurate. People may be testifying credibly, but the testimony may not be accurate for all types of reasons, faulty memory, for example. So, I mean, this issue was actually, I'm working off too far, this issue was actually, like, up on the Supreme Court right now. The Ninth Circuit, like, held recently that, like, if the fact that the immigration is credible, then you have to accept even her opinions that she's going to be killed in the future. But the greater point for now being, I'm not sure, my recollection, oh, the Ninth Circuit has gone that far, but just because an alien has been deemed credible, I'm sorry, a non-citizen has been deemed credible, I mean, it doesn't mean that you have to accept the non-citizen's opinion that she faces persecution if her children were a native country. Any other questions on that, or should I move on? I can't. Hello? Thank you. This is Judge Keenan. I'm done. Thanks, Mr. Stanton. Mr. Stanton, this is Judge Floyd. Is there any authority that requires an applicant to actively attempt to internally relocate before seeking asylum? Yeah, please, Jeff. The burden, Judge Floyd, is, like, the burden is on the applicant for asylum to prove that relocation would be unreasonable. And all she did here was say, well, there's gangs everywhere. She relied on country conditions evidence, and the agency here held that that's just not enough to meet that burden. So, I mean, unless there's some specific evidence showing why relocation would be unreasonable, then I guess the answer to your question is yes, then the alien, I'm sorry, I apologize, non-citizen, must show that he or she actually tried to move. As one said it, asylum is supposed to be an optional last resort for the applicant. It's not the first. Is your answer the same that if we found past persecution, would your answer still be the same? Waiting for the translation. All right. If you found past persecution, then the burden shifts to the government to demonstrate that the presumption is that the applicant would have a well-founded fear of future persecution and that the burden would be on the government to show that relocation is unreasonable. So, the immigration judge definitively held that she did not suffer past persecution. The board's opinion is a little ambiguous. Our brief was a little on the conservative side, but if you ask me to, like, for a definitive position on whether or not the applicant here suffered past persecution, my answer will be no, that the immigration judge was correct, and to the extent the board's decision can be a negative ruling either way, that the form affirms the immigration judge's finding. The death threats she received, most of them were indirect, and in Cortez Mendez, the court certainly doubted that indirect death threats could constitute past persecution, and the authorities where she cites where the court has found death threats to constitute past persecution, they were much, much more severe. Hernandez Avalos, for one, I mean, the gang actually put a gun to the mom's head and told her she had 24 hours to convince her son to join the gang or else she would be killed. So, it's not the menacing, immediate threat, but those are the types of authorities, those are the types of actions where it might be appropriate to find that death threat constitutes persecution. But to the extent the petitioner here is arguing that death threats are per se past persecution, the government does not agree with that at all. Well, counsel, this is Judge Motz, I think there's pretty clear Fourth Circuit precedent that a death threat does constitute persecution. But it doesn't have to be a gun to the person's head. Yeah, Mr. Stanton, we said that specifically in Hernandez Avalos. We said death threats are evidence of past persecution. Death threats are evidence of persecution. So, do all death threats constitute persecution, though, even if they go on for a long, long time? I mean, the gang here has plenty of opportunity to carry out their death threats and chose not to do so. So, common sense suggests that death threats may not have been of severity to constitute past persecution. Mr. Stanton, if we were to decide that there was a nexus between Diaz de Gomez's family ties and the past persecution, the threats that were made against her, is there evidence in the record that would rebut this presumption that would then arise of well-founded fear of persecution? What evidence is there to rebut that? There is indeed. Again, the fact that other family members have not been harmed, we discussed that earlier. There's also the fact that there's not enough evidence that the authorities would be unwilling or unable to protect her from the gangs. Obviously, I would concede that the Guatemala Police Department didn't distinguish themselves with respect to her one visit where she only talked about the threats. She didn't mention extortion. She didn't mention her brother being killed. She didn't mention the murder she witnessed in 2008. She only talked about, hey, these gang members are bothering me at school. They want me to sell drugs. In a perfect world, the Guatemala Police would have given her case the urgency that it merited. They chose not to do so. That being said, there's a lot of evidence in the record showing the Guatemala Police is actively trying to fight the gangs. They've arrested gang members. They've battled gang members. In 2008, the gang members that they murdered, the other gang members, they told the petitioner and her family, if you're standing in the authorities, we're going to kill you. Common sense suggests the gang members were actually afraid of the police. I think the court actually made the same point. I guess what I'm trying to figure out here, and maybe you can help me, Mr. Stanton, and this is Judge Keenan again, it seems to me if we have a shifting of the burden, if we disagree with you on the issue of family ties and past persecution being one central reason for her persecution, don't we have to vacate the other findings of BIJ and BIA and just send it back for a reexamination in light of the fact that we have found past persecution? It seems to me that it's really impossible for us to weigh evidence that was predicated on a finding that there wasn't past persecution, was not past persecution. You see what I'm saying? Yes. I would concede that if the court rules against us on nexus and also finds that it's inconclusive or rules against us on past persecution, then the agency's relocation determination would have to be reexamined because of the burden, as I mentioned to Judge Floyd, particularly Judge Floyd earlier, that the burden would then shift to the government. But with respect to the unable, unwilling, and the lack of harm to other siblings, I mean, that should be sufficient to uphold the finding that she does not have a well-founded fear of future persecution, Your Honor. Okay. And again, with respect to humanitarian asylum, let's jump to the other questions on asylum. Humanitarian asylum, it's pretty much tied to her statutory claim. Petitioner raises other serious harm, but she did not present that theory to the agency. And so she's not exhausted that particular theory. And with respect to the claims under Convention Against Torture, I would make many of the same arguments that she hadn't shown relocation. I don't think the burden shifts on her cap either. I'm not aware of any authority. The burden shifting will apply to asylum claims. And also, again, the evidence that the Guatemalan government is disemboweling the gangs. So, again, I know that this is a sympathetic case, and I can appreciate that some of the judges on the panel may have viewed the evidence differently than a few of the immigration judges. But this court actually said, in the immigration case a couple of months ago, after the briefs were filed, but standards of review, they're like offensive linemen in football. I mean, they get overlooked. They may not get the glory, but they're really important. They often determine whether a game is won or lost. There's an opinion by Judge Cuadobam. But I think that's the case here, that there's sufficient evidence, I'm sorry, substantial evidence, supporting the agency's denial of asylum and humanitarian asylum and cap. And the record does not show that the evidence compels reversal. I forgot to mention the imputed political opinion with respect to asylum. Again, the Supreme Court held in Elias-Zachariah that unwanted forced recruitment is not persecution on account of a political opinion. So, counsel said she cited some cases finding opposition to recruitment to constitute persecution. Those were all out-of-circuit decisions. That Jabril case, she miscited it as a fourth-circuit case. This is actually a seventh-circuit case. And those also involve quasi-political organizations. One was about the formation of a group opposed to the formation of Israel. Others were political guerrillas. And that's just not the key. Gangs, they don't really have political aims. They just want crime and power, control, money. That's really all they want. So, I will submit to you that it's unfortunate that the agency reached a corrective decision here. It should be upheld. If there are no other questions, I'm happy to rest on the briefs. Thank you very much. Do we have any rebuttals? Thank you, Your Honors. Very briefly, the briefs say everything that we need to say, but there is a point of context that I would like to point out. We've discussed this afternoon about relocation and whether it's reasonable or feasible for her to do it, whether she tried to do it. As I pointed out in my brief, the country, the entire country of Guatemala is roughly the size of Mecklenburg County, which is where Charlotte, North Carolina sits. So, when we're talking about internal relocation, and I think Mecklenburg County is probably roughly the size of the county in which the court sits in Richmond. So, when we're talking about internal relocation, we're talking about her going from one side of the county to the other side of the county. And we're talking about a country where our own State Department, year after year after year, filed a report saying that gang activity is extensive, pervasive, intrusive, and largely has infiltrated the police. And are much more well-funded than the police. So, I think it's easy for us maybe to sit in America and talk about internal relocation within the country as a means of avoiding harm. But that is a very different situation on the ground when we're talking about a country the size of Guatemala with the historic levels of gang activity both within the government and without. The one other thing I would point out is that I believe that there's simply the wrong legal standard applied to her request for humanitarian asylum. As I read the cases that I have researched, qualifying for statutory asylum is not a prerequisite to qualifying for humanitarian asylum. Those are different things. And I think that the IJ and the BIA adopted the IJ's conclusion that because she didn't qualify, they felt that she didn't qualify for statutory asylum. Well, that ended the question on humanitarian asylum. And I don't think that that's the state of the law. So, thank you for your time today and your patience with me as I try to figure out my first interlocution case. Well, we appreciate your argument. Thank you very much. Thank you. I'll ask the clerk to adjourn court. The court will take a brief break before hearing the next case.
judges: Diana Gribbon Motz, Barbara Milano Keenan, Henry F. Floyd